IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILFORD R. NUNN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:08-CV-1486-D |
| VS. | § | |
| | § | |
| STATE FARM MUTUAL | § | |
| AUTOMOBILE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant State Farm Mutual Automobile Insurance Company ("State Farm") moves to exclude the opinion testimony of two witnesses and to strike the supplemental report of one witness whom plaintiff Wilford R. Nunn ("Nunn") intends to call as an expert witness. The court grants in part and denies in part one motion to exclude and denies the other two motions.

I

This is a lawsuit brought by Nunn against State Farm arising from its denial of Nunn's insurance claim for fire damage to his Range Rover. According to Nunn, the Range Rover was stolen from his residence. When it was located, it had been damaged by fire. State Farm conducted an investigation, suspecting that Nunn or his daughter Kristina, the primary driver of the vehicle, had fraudulently staged the theft and fire. For purposes of this decision, the court will assume that it is not obvious how a thief could have operated the vehicle without using one of two computer-

programmed, authorized keys that were continuously in Nunn's and Kristina's possession throughout the time of the alleged theft.

Nunn sues State Farm for breach of contract and extracontractual claims arising from its denial of his insurance claim and the handling of the claim. State Farm asserts various affirmative defenses, including one for fraud, misrepresentation, and attempted arson.

State Farm moves to exclude the testimony of two expert witnesses whom Nunn has designated: George Callicoatt ("Callicoatt") and Rob Painter ("Painter").[1] Callicoatt has 28 years' experience as an estimator at Herb's Paint and Body Shop ("Herb's") and has repaired several of Nunn's vehicles. Callicoatt's work consists largely of body work or light mechanical repairs; he does not repair wiring, engines, or vehicle interiors. Any damage to a vehicle that he does not repair himself is subcontracted to others, such as mechanics and trim shops. Callicoatt prepared an estimate of $31,279.05 for Nunn for the total cost of repairing his Range Rover. He prepared the estimate by evaluating the vehicle to determine the parts that might need replacing. Callicoatt contacted various subcontractors to obtain price estimates on some parts. He then used CCC Pathways software

---

[1]State Farm also seeks *in limine* relief. Because the court normally decides motions *in limine* as trial-type motions at or near the pretrial conference, it will address only State Farm's request to exclude the evidence in question and will not refer to the motions as motions *in limine*.

to calculate estimates for the remaining needed parts. Nunn intends to call Callicoatt, who has never before testified as an expert, as an expert witness at trial on (1) the damage to the Range Rover, and (2) the cost to repair and/or replace damaged parts.

Nunn retained Painter, the second contested expert, in May 2009 to opine regarding how the Range Rover might have been stolen. On May 28, 2009 Painter, a self-described "forensic vehicle component analyst," received voluminous documents concerning the Range Rover and State Farm's denial of Nunn's claim. On June 5, 2009 Painter wrote his preliminary report before having an opportunity to inspect the vehicle. Beginning June 13, 2009, Painter examined the Range Rover for several days, and, in particular, he conducted a microscopic inspection of the vehicle's door lock and ignition. He produced a supplemental report on July 25, 2009. Following his August 4, 2009 deposition, he produced a second supplemental report on October 6, 2009 (delivered October 13, 2009), and an accompanying affidavit on October 22, 2009. Discovery closed on October 1, 2009. Painter concludes that the Range Rover was last operated in one of three ways: (1) by using an authorized key; (2) by using an unauthorized key; or (3) by using the Emergency Key Access ("EKA") system.[2]   He also posits that

_____

[2]Painter also originally opined that the vehicle may have been towed during the theft, but irrefutable contrary evidence (photographs showing the vehicle being driven through two toll

- 3 -

"destruction of evidence" by State Farm's experts early in the investigation prevents him from conclusively determining how the vehicle was last operated.

State Farm moves to exclude the expert testimony of Callicoatt and Painter, contending that it is speculative. State Farm also moves to strike Painter's October 6, 2009 supplemental report, contending it is not a proper supplement under Fed. R. Civ. P. 26(e).

II

The court turns first to State Farm's motions to exclude Callicoatt and Painter. The court decides these motions in its role as gatekeeper concerning the admissibility of expert testimony. *See, e.g.*, *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("[Fed. R. Evid.] 702 charges trial courts to act as 'gate-keepers'"). The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

An expert must be qualified. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training or education.'" *United*

───────────────────

booths) led Painter to withdraw this conclusion.

*States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593).

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Id.* (quoting *Daubert*, 509 U.S. at 592-93).  The testimony must constitute "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

"Whether an individual is qualified to testify as an expert is a question of law . . . . Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citations omitted).  The burden is on the proponent of the expert testimony

- 5 -

to establish its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

III

A

Nunn asserts that, due to Callicoatt's 40 years of experience working on cars, including 28 years at Herb's, he is qualified to testify as an expert on the damage to the Range Rover and the cost to repair the damage.  In his current position as manager of the body shop, Callicoatt writes approximately ten vehicle repair estimates each day, five days per week.  He also manages other employees who make vehicle repair estimates.

To prepare an estimate, Callicoatt visually inspects the damaged vehicle to determine which areas need work.  He then consults two sources to calculate the repair cost.  First, he uses a step-by-step software program, CCC Pathways, to provide model-specific estimates for part prices and labor needed for each damaged part of the vehicle.  According to Callicoatt, CCC Pathways is a standard industry estimating system, used by insurance companies, such as State Farm, and repair shops known as "pro shops" or "direct repair shops."  Second, Callicoatt contacts the various subcontractors whom he may hire to assist in the areas of repair that Herb's does not itself perform, including interior, electrical, mechanical, trim, or wheel work.  The subcontractors then provide estimates that Callicoatt uses to adjust the figures

provided by the CCC Pathways software.

Callicoatt testified that when preparing an estimate for an individual like Nunn, as opposed to an insurance company, he assumes that a part that is in borderline condition will be replaced instead of repaired.  He follows this approach so that the customer will not be surprised by a final price that is higher than the estimate.   For an insurance company, Callicoatt typically compiles a lower estimate because he can rely on an insurance company's paying a higher final cost, if needed.

State Farm objects on several grounds to Callicoatt's opinions.[3]   It maintains that Callicoatt's estimates are speculative because he specializes only in body work, of which the Range Rover needs little, if any.  A large portion of the repair work on the Range Rover would not be performed by Herb's, but would be subcontracted to other mechanics or specialists.  State Farm maintains that this demonstrates a lack of personal knowledge.  It also points out that Callicoatt performed only a visual inspection of the Range Rover lasting approximately one hour, and that he conducted no testing to determine whether certain parts were

_____

[3]In his first supplemental designation of experts, Nunn stated that he expected Callicoatt to testify about three additional matters: (1) the value of the Range Rover in its current condition, (2) the value of the vehicle after repair, and (3) the value of the parts of the vehicle if sold separately.  But in his response to State Farm's motion, Nunn agrees not to present Callicoatt as an expert in these areas.  Several of State Farm's objections to Callicoatt's qualification as an expert are therefore moot and need not be analyzed.

actually broken.   Further, Callicoatt admitted that his estimate was intentionally on the high side because it was prepared for Nunn, an individual.

B

The court holds that Callicoatt's estimate of the damage to the Range Rover is relevant to Nunn's damages claim.  But because the vehicle required repair work of a type that falls outside what Herb's normally performs, the court also evaluates whether Callicoatt is qualified to testify and whether the estimate he provided is reliable.

The court holds that Callicoatt is qualified by experience to offer the opinions at issue.  Although he lacks the expertise to perform personally many of the repairs that the Range Rover needed, and these repairs are not typically made by Herb's, he has sufficient experience for the court to conclude that he is qualified to offer the opinions at issue.  Callicoatt has 28 years' experience preparing preliminary estimates of vehicle damage, including damage other than body work.  He has amassed extensive experience.[4]  Moreover, although Callicoatt may not be an expert in repairing vehicle damage, he is an expert through long-term,

---

[4]Additionally, Callicoatt's lack of previous experience as an expert witness does not make him unqualified.  "[A proposed expert's] lack of experience as an expert witness is no bar to his testimony.  An expert witness must be an expert in a given field, not an experienced witness." *Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *5 (N.D. Tex. Jan. 14, 2010) (Fitzwater, C.J.).

frequent experience in preparing preliminary estimates of repair costs for individuals and insurance companies alike.

The court also holds that the opinions at issue are reliable. The court determines the reliability of an expert opinion by assessing the validity of the expert's reasoning or methodology. *Knight*, 482 F.3d at 352.   The court is not to focus on the conclusions generated by the expert's methodology.  *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).  Instead, the court must review only the reasonableness of the expert's approach regarding the specific matter to which his testimony is directly relevant.  *See Kumho*, 526 U.S. at 153; *Watkins*, 121 F.3d at 989. The court normally analyzes such questions by considering five nonexclusive factors known as the *Daubert* factors.[5]  "The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Kumho*, 526 U.S. at 150 (internal quotation marks omitted).  In this case, the *Daubert* factors are not particularly helpful in assessing Callicoatt's method.  And because neither party has briefed the

---

[5]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

*Daubert* factors individually with respect to Callicoatt's opinions, the court evaluates Callicoatt's methodology based on Nunn's responses to State Farm's specific arguments and on his proof that the testimony complies with the general *Daubert* standards. *See Perez Librado v. M.S. Carriers, Inc.*, 2004 WL 1490304, at *8 (N.D. Tex. June 30, 2004) (Fitzwater, J.).

State Farm fails to raise specific objections to Callicoatt's methodology, and it does not point to any specific cost repair estimate that it contends is unreliable.  It does not challenge the practice of contacting other mechanics to obtain specific price estimates or of relying on the CCC Pathways software.  And the record supports Callicoatt's opinions that his reliance on subcontractor estimates and the CCC Pathways software is routine and widely accepted in the industry, that insurance companies rely on CCC Pathways, and that State Farm relies on similar software. State Farm merely raises a categorical objection that because Callicoatt performs only body work, he cannot properly estimate the cost of repairing a vehicle that has sustained other types of damage.   The court disagrees and holds that Callicoatt's methodology is reliable and admissible.

State Farm does point specifically to Callicoatt's admission that the estimates he prepares for individuals are routinely higher than the ones he prepares for insurance companies.  But this admission does not indicate that his estimate in this case is

unreliable.  Callicoatt explained his basis for this practice: if actual repair costs greatly exceed preliminary estimates, insurance companies are more likely than individuals to agree to pay the additional amount.  He also opined that this practice was common in the industry.  This differential estimating practice is therefore a proper subject of cross-examination at trial, but not a basis to exclude his opinion entirely.  *See, e.g., Amigo Broadcasting, LP v. Spanish Broadcasting Sys., Inc.*, 521 F.3d 472, 485 (5th Cir. 2008) (holding, *inter alia*, that criticism of expert testimony that had already withstood *Daubert* challenge "affect[s] the weight to be assigned to that opinion . . . and should be left for the jury's consideration." (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (brackets in original; emphasis omitted)); *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted)).

Accordingly, the court concludes that Callicoatt is qualified by experience to testify as an expert concerning the damage to the Range Rover and the cost to repair the vehicle.  The opinions that State Farm challenges are relevant and reliable.  If State Farm has a basis to challenge the weight of Callicoatt's testimony, it can

do so through vigorous cross-examination or by offering evidence that refutes Callicoatt's opinions.  *See Rolls-Royce*, 2010 WL 184313, at *11.  State Farm's motion to exclude Callicoatt's testimony is denied.

IV

State Farm also objects to the opinion testimony that Nunn seeks to introduce through Painter.

A

Nunn retained Painter to determine how the Range Rover was last operated.  Painter has three decades of experience repairing automobiles, and approximately two decades of experience repairing theft-recovered vehicles; he has designed his own anti-theft products, authored various articles on auto theft and vehicle forensics, presented on the topic of vehicle forensics on behalf of various insurance companies, and provided consulting and training to law enforcement agencies; and he has received various certifications in automobile repair and fire investigation and testified numerous times in state and federal court.

Before inspecting the Range Rover, Painter prepared a preliminary report dated June 5, 2009.  In this report, he opined that there were four possible ways for the Range Rover to have been stolen.[6]  He raised the possibility that the vehicle was equipped

---

[6]As noted above, Painter suggested that the Range Rover might have been operated by an authorized key, an unauthorized key, or the EKA system, or it may have been towed.  Painter later conceded

- 12 -

with the EKA system, which allows the alarm to be disabled if the owner loses the key.  He also suggested that the most important forensic evidence is the "wafers" (or tumblers) of the ignition and door lock, which can bear stray scratches or striations if an object other than the usual key is inserted.  He described how each key's unique imperfections can create deep scratches in the wafers when used over time.  A foreign device inserted into the ignition or door lock can create scratches that visibly differ when examined under a microscope.  But Painter also pointed out that, in the two years between the fire and his inspection, one authorized key had been inserted into the ignition numerous times, which can polish away these stray marks, erasing evidence of a foreign key. Finally, he stated that, in his experience, thieves do not always steal vehicles to resell or to be sold for parts.  Instead, they often steal vehicles to use them in other crimes, only to leave them abandoned for a short period after the theft to test if the vehicle has a tracking system.  Painter also added that, in his experience, it is common for vehicles to be set on fire by someone other than the persons who stole the vehicle.

Painter inspected the Range Rover in June 2009.  On July 25, 2009 Painter provided a supplemental report detailing his microscopic examination of the Range Rover's ignition and door

---

that the evidence did not support the opinion that the vehicle had been towed, and he withdrew that part of his opinion.

lock.  He pointed out that one of the two authorized keys had been lost since the alleged theft, affecting his ability to match the second key with any marks on the wafers.  His report detailed that he found no scratches on the ignition wafers that would indicate the use of any object besides the remaining authorized key.  But Painter stressed that the continuous use of the remaining authorized key since the theft could have polished away any indications of another object.  Because of the use of that key through two years of investigations, Painter concluded that he could not arrive at a definitive conclusion as to how the vehicle was operated at the time of the alleged theft.  In addition, Painter investigated the door lock but found very few striations, indicating that the owners had routinely used the keyless entry remote transmitter to unlock the doors instead of a key.  Again, Painter found no evidence of another tool's being inserted in the door lock.

Painter's supplemental report also criticized State Farm's investigation of the vehicle.  Painter objected that State Farm's experts had not conducted a lock examination and had used the key in the ignition lock, possibly destroying evidence.  He also addressed the possibility that the Range Rover was equipped with an EKA system, an option that he said State Farm had ignored.  Painter stated that the Range Rover might have been unlocked on the night of the theft, despite Kristina's testimony that she locked it,

because remotely locking the vehicle can often be ineffective for various reasons, including that the remote may be too far away from the vehicle.  Finally, Painter cited the dangers of inhaled gasoline, and because the vehicle smelled strongly of gasoline during his inspection, he believed presented a biohazard and was not repairable.

Painter was deposed in August 2009, and State Farm's attorneys requested additional information.  Painter prepared a second supplemental report dated October 6, 2009, and an October 22, 2009 affidavit that is materially indistinguishable, if not identical. Painter asserts in the second supplemental report that the 2006 Range Rover owner's manual used by State Farm's expert in depositions indicates that the EKA system was available in Nunn's Range Rover.  Painter asserts that this new information alters his deposition testimony.  The report also further details Painter's allegations that State Farm did not properly preserve evidence. Painter concludes that no one can definitively discover how the Range Rover was operated during the alleged theft.

State Farm asks the court to exclude Painter's testimony. First, State Farm argues that Painter's resume is filled with inaccurate statements, expired memberships, designations given by an organization Painter founded, and even a designation Painter was apparently stripped of due to ethics violations.  Second, State Farm argues that none of Painter's theories as to how the Range

Rover may have been operated during the alleged theft is supported by any evidence. According to State Farm, they are mere speculation because Painter has admitted that he cannot determine how the Range Rover was operated.[7]

B

1

The court first addresses Painter's general qualifications as an expert in vehicle forensics. Nunn argues that Painter is clearly qualified due to his extensive experience in the field. State Farm objects to Painter's qualifications on several grounds. It highlights that Painter has no higher formal education than a GED, potentially indicating a lack of capability. Nunn counters that academic achievement is not particularly relevant.

The court agrees with Nunn that Painter's level of formal education is not determinative or particularly relevant to the specific opinions that he intends to offer in this case. Although the subject matter is appropriate for expert testimony, the

---

[7]State Farm also points to three courts that have in some way limited Painter's expert testimony. The court does not find this history relevant, however, because the limitations in each case were fact-specific. *See, e.g.*, *Farmers Ins. Exchange v. Salazar*, No. 04-CE-CG-01366 (Super. Ct. Cal. Oct. 10, 2005) (included at D. Painter App. 22) (in bench trial, excluding in its entirety Painter's opinion as to whether vehicle was stolen because Painter had not had chance to inspect vehicle's locks, which he himself had deemed "crucial" to his ability to render an opinion). This court is not bound by any other court's decision in another case, and it evaluates Painter's proposed testimony according to the *Daubert* standards generally and to the specific circumstances now before the court.

witness' expertise can be developed by experience and other means apart from formal education.

State Farm also argues Painter is unqualified because he testified in his deposition that he could not specifically recall working before on a Range Rover or Land Rover. Again, the court concludes that this lack of specific experience is not determinative. State Farm has not demonstrated that a Range Rover or Land Rover has materially different features from the vehicles that Painter has examined and on which he has developed his expertise. Indeed, his microscopic evaluation of the vehicle's locks and opinions about such matters as striations do not appear to be specific to Range Rovers.

State Farm more specifically attacks Painter's qualifications by noting numerous inaccuracies in his resume. For example, several of the organizational memberships listed on Painter's resume, such as to the American College of Forensic Examiners, are out of date and have not been renewed. Similarly, his certification as an "Auto, Collision, Med/Hvy/Duty Truck Technician" by the National Institute for Automotive Service Excellence has not been renewed since 2002, and his certification as a "Vehicle Fire Investigator" by the National Association of Fire Investigations has not been updated since 2005. Painter's resume also states that he is a "Certified Forensic Locksmith" by the International Association of Investigative Locksmiths, but his

membership was apparently revoked in August 2006 for ethical violations that Painter disputes.

Despite these apparent inaccuracies——which if established at trial could provide State Farm considerable ammunition for cross-examination——the court finds that Painter is qualified to offer the opinions at issue. The record demonstrates that Painter has extensive experience and training in the field of vehicle forensics and forensic locksmithing. He is frequently consulted as an expert on the topic and has almost two decades of experience working with recovered vehicles, repairing an estimated 10,000 theft-recovered and fire-damaged vehicles. He has written extensively in the area and conducted numerous seminars on vehicle forensics, even being hired to train insurance company employees. He has clearly specialized in vehicle forensics and gained relevant experience. Despite State Farm's specific objections to putatively misleading items on Painter's resume, it cannot suggest that Painter lacks expertise in the subject matter. The court finds that Painter is qualified under Fed. R. Evid. 702 to present testimony on vehicle forensics.

2

The court next considers whether Painter's specific proposed testimony is relevant, of assistance to the jury in this case, and reliable. Painter's proposed testimony can be grouped to form the following principal opinions: (1) the wear patterns on the

vehicle's locks do not contain evidence of newly-made striations from objects other than the remaining authorized key, although such evidence may have been destroyed; (2) the Range Rover may have been driven during the alleged theft by using an authorized key, an unauthorized key, or the EKA system; (3) State Farm's investigation of the vehicle was severely flawed and may have resulted in the destruction of evidence; and (4) general observations about car theft, including, for example, that remote-locking a vehicle does not guarantee that the vehicle is locked, and that thieves may temporarily abandon a stolen vehicle to allow it to "cool off."

The court will address the relevance and reliability of each of these opinions in turn.

3

The court concludes that Painter's proposed testimony about his microscopic investigation of the Range Rover locks is relevant. The jury may find the lack of evidence of lock tampering to be of assistance in deciding an issue at the heart of this case: whether the Range Rover was stolen.  In addition, Painter's caveat—that some striations may have been polished away by the continued use of the authorized keys during the investigation—will allow the jury to determine the appropriate weight of this evidence.

State Farm objects to Painter's testifying about his microscopic investigation of the Range Rover locks, contending that his method is unreliable.  State Farm maintains that looking for

errant scratches under a microscope does not meet *Daubert* factors for reliability because Painter did not present evidence that the technique can be tested, that it has been subject to peer review and publication, what its error rate is, or whether it is generally accepted as valid in the scientific community.

The court concludes that State Farm's attempt to subject Painter's technical methods to the *Daubert* factors is misplaced. While experts testifying on the basis of technical knowledge must meet *Daubert*'s general standard of reliability, *see Kumho*, 526 U.S. at 149, the court will not always find the *Daubert* factors helpful in evaluating the reliability of an expert's method, *id.* at 152 ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."). The court holds that Painter's methods cannot helpfully be analyzed according to the *Daubert* factors, so instead the court analyzes the internal logic of Painter's method, "determin[ing] whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592) (second alteration in original). Painter explains that keys and other objects make scratches in the wafers of a lock. Routine use of a key would produce patterns of scratches, and, similarly, novel objects would create novel scratches. Painter bases this testimony on extensive experience with locksmithing and vehicle forensics. The court deems Painter's

- 20 -

methodology to be reliable and unobjectionable.  Thus the court concludes that Painter's proposed testimony about his microscopic analysis of the Range Rover's locks is relevant and reliable.

4

The court next considers the relevance and reliability of Painter's theory as to the three possible ways the Range Rover may have been operated during the alleged theft.  The first possibility——with the authorized keys——is clearly unobjectionable, and is in fact consistent with State Farm's theory of the case.  Painter presents two further possibilities to counter State Farm's assertion that the Range Rover *must* have been operated with authorized keys.

Painter's second proposition is that an unauthorized duplicate key was made.  In Painter's October 6, 2009 second supplemental report, he suggests that any individual with a "T-4 scanner or equivalent" could take an authorized key and make an exact copy of it, so that although the dealership would have record of only two keys, there would actually be three.  Key #2 and Key #3 would register as only as a single key because they would be exact copies of each other.  Painter testified that "[a]nything can be duplicated," D. Oct. 2, 2009 App. 99,[8] but he acknowledged that the Range Rover keys, which contain an encrypted microchip that disarms

_____

[8]The court cites the appendixes by identifying the filing party, the date filed, and the appendix page number.

the vehicle's immobilization system, are designed only to be duplicable by the Range Rover dealership or the manufacturer. Without the correctly-encrypted microchip, the vehicle's engine will not start.[9] Painter agreed that the pertinent dealership only has a record of two authorized keys, and that he has no information that would lead him to believe a third key had been made.

To be admitted, Painter's testimony must be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. But Painter's unauthorized key theory is entirely speculative, with no basis in evidence. "Testimony is irrelevant . . . when an expert offers a conclusion based on assumptions unsupported by the facts of the case." *Rolls-Royce*, 2010 WL 184343, at *6. Painter's theory relies on the assumption that an unauthorized key was made by copying one of the two authorized keys, which would obviously require temporary possession of one of the authorized keys. But there is no evidence that the two authorized keys were ever out of Nunn's or Kristina's possession. There is simply no support for the theory that a third key was made without their or the dealership's knowledge. Because Painter's crucial assumption is unsupported by the facts in the record, his unauthorized key theory should be excluded. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (holding that admission of

---

[9]Painter asserts that the EKA system is the only way to start the engine without the correct microchip.

economist's damages model used to show plaintiff's damages was abuse of discretion because model relied on assumptions that were contradicted by facts in the record).  The court therefore grants State Farm's motion to the extent of precluding Painter from testifying at trial about the possibility that an unauthorized key was used to start the Range Rover on the occasion in question.

Painter's third proposal is that the Range Rover may have been operated using the EKA system.  EKA, available on Range Rovers sold in Europe, is a way to disarm the Range Rover's alarm and transponder in case of emergency.[10]  Painter believes that the EKA system is available on some Range Rovers sold in the United States——a belief based on Internet postings, not provided to the court, by Range Rover owners (laypersons) and "AllData," an unidentified source.  Painter concedes that "there were conflicting opinions about the availability of this system in North American vehicles."  P. Oct. 30, 2009 App. 79.  The EKA system disarms the Range Rover's alarm by using a generic "combination" available over the Internet to open the Range Rover's door lock.[11]  Painter speculates that the EKA system may have been available on Nunn's

---

[10]Painter's testimony does not clarify whether the EKA system could start the vehicle in addition to unlocking the Range Rover's doors.  It appears that the EKA system merely disables the alarm in case of some alarm malfunction, allowing the vehicle then to be started with the authorized key, as usual.

[11]This "combination" involves rotating the door lock in each direction, according to a predetermined sequence.

- 23 -

Range Rover.   He never tested Nunn's Range Rover to determine conclusively whether it had the EKA system feature, because that system requires electrical power, and the Range Rover's battery was dead during his inspection.   In his deposition, Painter admitted he had "no scientific evidence . . . that supports the proposition that [the Range Rover] was started via the EKA procedure on the night of the theft."  D. Oct. 2, 2009 App. 100.

To support his EKA theory, Painter points to a 2006 Range Rover owner's manual (not Nunn's owner's manual) that was used by State Farm's expert in depositions.   The manual refers to an "emergency key" in the following statement:

> You have been supplied with two remote handsets with integral keys which operate all locks and an emergency key, designed to fit into a wallet or purse. The emergency key can be used to open the doors only and has no remote functionality. NOTE: *The emergency key should not be used for extended periods of time*.

P. Oct. 30, 2009 App. 121 (bold font omitted; italicized font in original).   But Painter's reliance on this reference to establish that Nunn's Range Rover was equipped with the EKA system is questionable, because the manual also clearly indicates that the "emergency key" cannot start the vehicle.   State Farm challenges the reliability of Painter's EKA theory.   It maintains that Painter has no factual or scientific basis to opine that Nunn's Range Rover was equipped with EKA, and that his opinion is improper speculation.   The court agrees.

- 24 -

To be admissible, Painter's opinion testimony must constitute "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  Painter admits that he did not test Nunn's Range Rover to determine whether it was equipped with EKA, and he acknowledges that there is conflicting evidence about whether the EKA system is available on American Range Rovers.  Painter's speculation relies on evidence not submitted to the court, and, in any case, of dubious quality.  Internet message board postings by Range Rover owners are not a reliable basis to form an expert opinion unless the expert establishes that they are the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.  *See* Fed. R. Evid. 703.  Painter has not made this showing.  Similarly, no foundation has been laid to enable the court to conclude that "AllData" is a reliable source.  Additionally, Painter's reference to the 2006 Range Rover owner's manual produced by State Farm is also inadequate.  The manual only refers to an emergency key, not to EKA, and the manual clearly refers to a type of key that cannot start a Range Rover.  Nunn has not demonstrated that Painter's theory relies on evidence reasonably relied upon by experts in his field.

Painter has not established that Nunn's Range Rover was equipped with EKA, and he has not even made clear that the EKA system would enable a person without an authorized key to drive the

vehicle (as opposed to merely unlock it or disable the alarm). Although Painter is qualified in vehicle forensics, the court must ensure that he "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.  Nunn has made no such showing as to the EKA theory.  The court therefore holds that Painter's EKA theory is speculative and unsupported, and it grants in this respect State Farm's motion to exclude his opinion testimony.

5

The court next addresses the relevance and reliability of Painter's testimony regarding his criticisms of State Farm's investigation of the vehicle and the possible destruction of evidence.  Painter points to State Farm's alleged loss of the second authorized key as one factor in his inability to determine conclusively how the Range Rover was last operated.  Additionally, Painter criticizes the fact that the Range Rover computer's error codes were not preserved for inspection.  These error codes alert technicians to problems, including that the vehicle's security system has been breached or that the vehicle's alarm went off. According to the report of State Farm's own expert, a technician uploaded information from the Range Rover's computer while changing the vehicle's transponder coil, which Painter maintains erases codes.  Additionally, another State Farm expert noted that the

vehicle's computer displayed 165 error codes 1½ years later, but the expert testified that he did not make a record of those codes before changing the Range Rover's battery, which Painter argues deleted some codes.[12] Finally, Painter criticizes the fact that the Coppell Fire Investigator assigned to the case may have failed to wear gloves while investigating the vehicle.

The court has already concluded above that it will allow Painter to testify that the absence of the second authorized key prevented him from definitively establishing that all scratch marks in the Range Rover's locks were made by the two authorized keys. This fact is an important caveat to Painter's conclusions and is the proper subject of testimony.  But the record does not contain reliable evidence concerning *how* the second key was lost, nor is his expertise relevant to this fact.  Therefore, while Painter may testify as to the effect of the key's absence, he cannot speculate as to the reasons why the key was lost.

As for Painter's objection to the handling of the computer codes, the evidentiary value of such codes is within his expertise. Painter may testify concerning how the actions of the Land Rover technician or State Farm's experts could have caused the erasure of computer codes containing relevant information.  Such testimony would be relevant to the jury in explaining why the Range Rover

---

[12]State Farm's expert denies that he destroyed evidence, arguing that any essential codes would not have been cleared merely by changing the battery.

computer contains no record of, for example, the vehicle's alarm going off.  As an expert in vehicle forensics, Painter may explain the typical usefulness of such information in his investigations. "Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'"  *Kumho*, 526 U.S. at 148 (quoting *Daubert*, 509 U.S. at 592).  If State Farm disagrees with Painter's critique, it is free to present testimony from its own experts and to cross-examine Painter to establish that no evidence was destroyed.  The court reiterates that Painter cannot testify as to what the Land Rover technician or the State Farm experts did, because he has no first-hand knowledge of these facts.  But Painter may articulate any problems with the handling of the codes and suggest the importance of the codes in forensic analysis.

Finally, Painter cannot testify regarding the actions of the Coppell Fire Investigator.  Nunn has not established that whether the fire investigator wore gloves is relevant in Painter's expert analysis.  Again, to be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Pipitone*, 288 F.3d at 245 (quoting *Daubert*, 509 U.S. at 589).  The question at issue——and to which Painter's expertise is related——is how the Range Rover was driven during the alleged theft.  Nunn makes no connection between that question and

unidentified fingerprints.  There is no suggestion that any potential fingerprints hindered Painter or anyone else in investigating the vehicle and determining how it was last operated. In fact, Painter never indicates that he even inspected the Range Rover for fingerprints or that he typically does so.  Therefore, the court holds that this proposed testimony is irrelevant and potentially misleading to the jury.

6

Finally, the court addresses the relevance and reliability of Painter's general observations about automobile theft, such as that remote-locking a vehicle does not guarantee that the vehicle is locked.  Painter's two decades of experience in dealing with automobile theft establish his expertise in the field and, for example, his familiarity with patterns in thieves' behavior.  The reliability of Painter's observations derives from this experience. Additionally, such general observations may be helpful background information for the jury and are therefore relevant.  Of course, Painter cannot speculate about such matters as whether Kristina in fact locked the Range Rover on the night of the alleged theft, but he can provide useful background information about patterns in automobile theft that would be relevant for a limited purpose. *See* Fed. R. Evid. 702 advisory committee's note ("The rule accordingly recognizes that an expert on the stand may give . . . exposition of scientific or other principles relevant to the case, leaving the

trier of fact to apply them to the facts."); *Rolls-Royce*, 2010 WL 184313, at *3 (allowing expert testimony on background information).

### C

To summarize, the court will allow Painter to testify regarding (1) his microscopic investigation of the Range Rover locks, (2) the effect of the loss of the second authorized key on his observations, (3) the potential loss of important information through State Farm's handling of the Range Rover computer codes, and (4) general background information on automobile theft patterns. The court will not allow speculative testimony on the possibility of unauthorized keys or on the EKA system. In addition, the court will not allow Painter to testify as to the alleged actions of the Coppell Fire Investigator or the consequences of those actions, because Nunn has not demonstrated the relevance of such testimony.

### V

The court now addresses State Farm's motion to strike Painter's second supplemental report.

### A

Rule 26(a)(2)(B) provides that the disclosure of certain expert witnesses must be accompanied by a written report that contains, *inter alia*, "a complete statement of all opinions the witness will express." Rule 26(e) addresses the duty to supplement

or correct Rule 26(a) disclosures and discovery responses.

> [Rule 26(e)(2)] requires that, with respect to a retained expert, there is a duty to supplement the expert's opinion if there is a material change in the opinion. This obligation extends to both the report required by Rule 26(a)(2)(B), as well as the expert's deposition testimony.

*Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 502 (D. Md. 1997) (referring to former Rule 26(e)(1)). Additionally, Rule 26(e)(1) allows for supplementation in the event of the discovery of new information. *See Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E.*, 2004 WL 5495589, at *2 (W.D. Tex. Oct. 8, 2004) ("This requirement anticipates a situation in which an expert submits a report, then, subsequently discovers new information rendering the report incorrect and mandating supplementation."). "This supplementation must occur not later than the date of the pretrial disclosures required by Rule 26(a)(3)." *Sullivan*, 175 F.R.D. at 502; *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 570 n.43 (5th Cir. 1996) ("[Rule 26(e)(2)] requires that supplementation of expert disclosures be made by the time the supplementing party's 'Pretrial Disclosures' are due." (referring to and citing former Rule 26(e)(1))); *see Jacobs v. Tapscott*, 2006 WL 2728827, at *11 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) (holding that supplementation of expert's report was due by the deadline for Rule 26(a)(3) pretrial disclosures), *aff'd*, 277 Fed. Appx. 482 (5th Cir. 2008).

- 31 -

B

At the time Painter submitted his second supplemental report on October 13, 2009, the trial of this case was set for February 1, 2010.  Pretrial disclosures under Rule 26(a)(3) were not due until 30 days before trial.  Therefore, the supplement was timely under Rule 26(e)(2).  Moreover, the trial setting has now been continued to the August 2, 2010 trial docket.  Painter's supplement was submitted substantially before the currently-scheduled trial date, and, as noted, before the deadline that applied to the February 1, 2010 trial setting.

Even though the second supplemental report is not untimely under Rule 26(e)(2), the court has the discretion to decide whether to permit trial testimony based on information that is newly disclosed in a supplemental report.  In *Jacobs* this court explained that, in exercising its discretion,

> the Court should consider the following factors: (1) the explanation for making the supplemental disclosure at the time it is made; (2) the importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation; (3) potential prejudice to an opposing party; and (4) the availability of a continuance to mitigate any prejudice.

*Jacobs*, 2006 WL 2728827, at *12 (quotation marks omitted) (quoting *Tucker v. OHTSU Tire & Rubber Co.*, 49 F.Supp.2d 456, 461 (D. Md. 1999)).  The district court has "'wide latitude' in pretrial matters" and in applying these factors.  *Campbell v. Keystone*

*Aerial Surveys, Inc.*, 138 F.3d 996, 1000 (5th Cir. 1998) (quoting *Davis v. Duplantis*, 448 F.2d 918, 921 (5th Cir. 1971)).

C

Regarding the first factor, Nunn's explanation for the supplemental disclosure is that Painter has now considered new evidence that was unavailable before the issuance of the first supplemental report, and he has made material changes to his opinion. Painter's second supplemental report relies in part on testimony from the August 19, 2009 deposition of State Farm's expert, Michael Ortiz ("Ortiz"). This deposition was taken after Painter's first supplemental report of July 25, 2009, and therefore constitutes new evidence. In particular, Painter believes that the Range Rover owner's manual cited in Ortiz's deposition materially affects his earlier testimony, providing (in his view) support for his EKA theory. Ortiz's deposition also provided more information about his handling of the Range Rover error codes. In addition, the second supplemental report contains material changes in Painter's testimony, correcting previously incorrect statements. Painter now states that he no longer believes that the Range Rover could have been towed during the alleged theft. The court finds these explanations satisfactory.

D

At to the second factor, the court also notes that the changes in Painter's testimony are crucial to the case——particularly since

Painter no longer believes that the Range Rover was towed during the alleged theft.  Additionally, Painter is a central expert for Nunn.  Therefore, the second factor weighs in favor of allowing Painter to testify based on information that was first disclosed in the supplemental report.

E

Under the third and fourth factor, the court considers whether allowing Painter's testimony prejudices State Farm and whether such prejudice can be ameliorated by a continuance.

The heart of State Farm's objection to the second supplemental report is its new opinion regarding the EKA system.  But the court has already limited Painter from testifying regarding the EKA system, so there is no reason to conclude on this basis that allowing Painter to testify about this information (first disclosed in the second supplemental report) is unduly prejudicial.  State Farm in fact requested during Painter's deposition that he provide a supplementary explanation.  And the report was submitted almost ten months before the current trial setting.  The trial has been continued twice for other reasons, allowing State Farm ample time to respond to the information contained in the second supplemental report.  The court concludes that allowing the second supplemental report will not unduly prejudice State Farm.  Therefore, the court declines to strike Painter's second supplemental report.

*     *     *

Accordingly, the court denies State Farm's September 30, 2009 motion to exclude the testimony of Callicoatt, grants in part and denies in part State Farm's October 2, 2009 motion to exclude the testimony of Painter, and denies State Farm's November 13, 2009 motion to strike Painter's second supplemental report dated October 6, 2009.

**SO ORDERED.**

June 22, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

– 35 –